IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UKYONG CHONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. |
| | ) | |
| LEADCRUNCH Inc. | ) | |
| a Delaware Corporation, | ) | Plaintiff Demands |
| | ) | Trial by Jury |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

NOW COMES Plaintiff, Ukyong Chong, by and through his attorneys, Favaro & Gorman, Ltd., and for his Complaint against the Defendant LeadCrunch, a Delaware corporation, states and alleges as follows:

### Parties

1. Plaintiff, Ukyong Chong, (hereinafter "Chong"), is an individual residing in Hoffman Estates, Cook County, Illinois.

2. Defendant, LeadCrunch Inc. (hereafter "LeadCrunch") is a Delaware corporation, with its principal place of business in San Diego, CA.

3. Diversity jurisdiction in this Court is invoked under 28 U.S.C. §1332(a).

4. As Chong's employment with LeadCrunch occurred in the state of Illinois and he was present in Illinois when terminated, venue is proper in this Court.

5. From April 1, 2017 to September 5, 2019, Chong was an employee of LeadCrunch.

6. Prior to Chong's employment with LeadCrunch, Chong was employed in sales at Ziff Davis B2B.

7. On or about February, 2017, Chong was contacted by LeadCrunch for recruitment.

8. During the recruitment process, LeadCrunch represented to Chong that he would be heading a sales team selling AI Powered Demand Generation Programs (the "product") and that product would utilize a four (4) phase process and artificial intelligence ("AI").

9. The integration of AI into such a product would provide a wholly unique entity in the marketplace.

10. Intrigued by LeadCrunch's representation, Chong agreed to accept the offered employment.

11. Chong began his employment on April 1, 2017 as Vice-President of Sales, working for a month as an independent contractor.

12. In that role, and throughout the duration of his employment, Chong was responsible for growing revenue from $00.00 to $14 million dollars run rate in the first 27 months and 360% annual growth in the second year in market.

13. During his employment, Chong oversaw a team of 5-10 salespeople, who worked nationally.

14. During his employment, Chong worked out of his home office in Hoffman Estates, Illinois, traveling throughout the nation.

15. When Chong began employment, among his first projects was to build go-to-market sales positioning presentations (the "playbook") for his sales team.

16. In doing so, Chong incorporated references to AI, and a four phase process, based on the representations made by the executive team and AI and its application.

17. Chong directed his sales team to use the playbook in presenting the product to their customers and potential customers.

18. Chong, himself, used the playbook in presenting the product to his customers and potential customers.

19. In December 2017, Chong noticed problems with client retention and began to investigate whether the product was delivering what it promised.

20. On information and belief, in the first quarter of 2018, a sales team member who left the LeadCrunch's employment made statements to former clients that LeadCrunch was not using AI in its product; in response to these statements, LeadCrunch initiated actions to prevent further such disclosures by this former salesperson.

21. By the end of the first quarter of 2018, questions about whether AI is truly being utilized are asked by the sales team.

22. By the end of the first quarter, Chong realized that the representations that were presented to customers mispresented the real attributes of the product.

23. By the second quarter, 2018, Chong was fielding direct questions regarding proof of the technology that was being utilized.

24. In September, 2018, management acknowledged that very little AI, if any, was used in the product; in light of that, the Executive Team puts together an "initiative" to get AI into the product.

25. In November, 2018. Olin Hyde, CEO, acknowledges to the sales team that LeadCrunch needs to get AI into the product.

26. During 2018, Chong was receiving reassurances that AI was being incorporated into the product and that the four-phase program was operational.

27. In February, 2019, the Executive Team rolls out "Core AI" programs and presents that LeadCrunch will now be able to run 100% AI programs for clients.

28. On information and belief, in June, 2019, a data scientist was terminated from his employment apparently for stating that LeadCrunch was not truly using AI.

29. On information and belief, in June, 2019, a senior sales team member resigned due to lack of confidence in the product.

30. At the end of August, 2019, Chong participated in retention team meetings held by select department heads.

31. In the course of those meeting, Chong asked if LeadCrunch was incorporating AI into the product and learns that LeadCrunch is still not incorporating AI info even in the "Core AI" program due to "various" issues.

32. On information and belief on September 3, 2019, another senior team member resigned due to lack of confidence in the product.

33. On September 4, 2019, an executive meeting was held to review findings from the retention team.

34. In that meeting, the retention team stated that LeadCrunch needed to try truly to get AI into the product.

35. Chong participated in this executive meeting by phone from his home office.

36. At the end of the meeting, Chong stated that he was not comfortable lying to both the clients and sales team and that LeadCrunch either need to keep its brand promise or change it.

37. Immediately upon expressing his opinion, Olin Hyde, CEO told Chong that he would be calling him in the morning.

38. The very next morning, Chong received a call from Olin Hyde, CEO accompanied by an officer and a director of LeadCrunch, at which time he was told that his employment was terminated.

39. No reason was stated for termination, other than it was time to "part ways".

40. To the extend there is a stated reason contained in the preceding paragraph, said reason is pretextual.

41. Throughout the term of Chong's employment, he performed the duties assigned to him, received praise for his efforts and was not subject to any negative performance reviews, performance improvement plans, discipline or threat of termination, and received additional responsibility and in April, 2019, Chong received a base salary increases from $100,000.00 annually to $250,000.00 annually and an overall OTE to be $650,000.00.

42. Chong's expression that he would no longer participate in lying indicated a refusal to engage in unlawful practices that he reasonably believed violated the law, specifically the laws regarding deceptive business practices the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, et seq.; the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq., the Lanham Act, 15 U.S.C. § 1125; and the theft by deception provision of the Illinois Criminal Code, 720 ILCS 5/16-1(a)(2).

43. Chong held the responsible belief that LeadCrunch's activities, in misrepresenting its product to his customers violated the law.

44. Chong was discharged in contravention of a clearly mandated public policy of the State of Illinois in protecting businesses against fraud as embodied in the laws referenced above.

45. As a result of LeadCrunch's wrongful actions, Chong has suffered, and will continue to suffer, emotional distress and economic injuries, including lost wages and benefits.

46. LeadCrunch wrongful actions were deliberate and wanton and, therefore Chong demands punitive damages in addition to his compensatory damages.

Wherefore, Plaintiff, Ukyong Chong , prays this Honorable Court of the following:

a. Compensatory and other damages in an amount not less than $75,000 and to be determined by a jury at trial;

b. Any back pay with interest in an amount to be determined at trial;

c. Punitive damages in an amount to be determined at trial; and

d. Any and such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, Ukyong Chong demands a trial by jury on all counts properly submissible to a jury.

Respectfully Submitted,

Favaro & Gorman, Ltd.

By: /s Patrick J. Gorman
Patrick J. Gorman, one of
Plaintiff's attorneys

Dennis R. Favaro/ 6193849
dfavaro@favarogorman.com
Patrick J. Gorman / 6185111
pgorman@favarogorman.com
Favaro & Gorman, Ltd.
9510 Turnberry Trail
Lakewood, IL  60014
815/477-1110